IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J.K. HILL & ASSOCIATES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 14-16-SLR |
| | ) |
| PKL SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM**

At Wilmington this 5th day of February, 2014, having reviewed the papers filed in connection with plaintiff's motion for injunctive relief, and having heard oral argument on the same; the court concludes that said motion (D.I. 1) should be granted, for the reasons that follow:

1. **Standard of review.** "The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The grant of a preliminary injunction is considered an "extraordinary remedy" that should be granted only in "limited circumstances." *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). The moving party for injunctive relief must establish: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Id.* (citation omitted). The burden lies with


the movant to establish every element in its favor or the grant of a preliminary injunction is inappropriate. *See P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005). If either or both of the fundamental requirements – likelihood of success on the merits and probability of irreparable harm if relief is not granted – are absent, an injunction cannot issue. *See McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994).

"Where a plaintiff seeks a mandatory preliminary injunction, rather than a prohibitory preliminary injunction, the burden of showing an entitlement to relief is greater." *Hart Intercivic, Inc. v. Diebold, Inc.*, Civ. No. 09-678, 2009 WL 3245466, at *3 (D. Del. Sept. 30, 2009). "A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (citing *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980)).

2. **Background.** Effective January 8, 2009, defendant PKL Services, Inc. ("PKL") entered into a contract with the United States[1] to perform selected maintenance tasks on several helicopters ("the Prime Contract"). (D.I. 11, ex. A) To "aid in the performance of the Prime Contract," PKL obtained the services of plaintiff J.K. Hill & Associates, Inc. (JKH"), with the parties entering into a subcontract effective February 5, 2009 ("the Subcontract"). (D.I. 3, ex. A) Of relevance to the dispute at issue are the following sections of the Subcontract:

2. **PERIOD OF PERFORMANCE**

---

[1] More specifically, Prime Contract #N00421-09-C-0023.

The services shall be performed during the period of performance of the Prime Contract, including all Options and extensions thereto. **Prime Contractor** shall, to the extent permitted by Federal law, extend this Agreement with written notice within five (5) days of receiving written notice of extension by the Customer to the **Prime Contractor**, exercising each Option period with **Subcontractor** followed by a written modification signed by both parties as indicated below:

| Option | Period of Performance |
|---|---|
| Base Period | 02/05/2009 – 8/04/2009 |
| Option Period One | 08/05/2009 – 02/04/2010 |
| Option Period Two | 02/05/2010 - 08/04/2010 |
| Option Period Three | 08/05/2010 - 02/04/2011 |
| Option Period Four | 02/05/2011 - 08/04/2011 |
| Option Period Five | 08/05/2011 - 02/04/2012 |
| Option Period Six | 02/05/2012 - 08/04/2012 |
| Option Period Seven | 08/05/2012 - 02/04/2013 |
| Option Period Eight | 02/05/2013 - 08/04/2013 |
| Option Period Nine | 08/05/2013 - 02/04/2014 |

6. **STATEMENT OF WORK AND PERFORMANCE**

\* \* \* \* \*

J.K. Hill Head Count for Lot 3 (AH-1W/UH-1N/CH53D/E) & lot 4 (CH-46E) as provided to PKL for RESET RFQ N00421-08-R-0073 and awarded under N00421-09-C-0023. Per the Teaming Agreement, dated 7/07/08, J.K. Hill will maintain 25% of the headcount on Lot 3 and 37% of the headcount on Lot 4.

\* \* \* \* \*

In the performance of these services the **Subcontractor** will provide the necessary labor required to perform its work under this Agreement, unless otherwise required by the **Prime Contractor**.

\* \* \* \* \*

### 8. CHANGES IN STATEMENT OF WORK

Changes in the Prime Contract SOW may be initiated by the Government or the **Prime Contractor**. It is understood and agreed by both the **Prime Contractor** and the **Subcontractor** that only changes to the Prime Contract SOW, directed and/or approved in writing by the Government, may be implemented under the Changes clause. The **Subcontractor** is specifically prohibited from making any unilateral changes to the Prime Contract SOW.

(A) **Changes Initiated by the Government.** The Government may from time to time direct changes to the Prime Contract SOW by issuing a written request or statement to the **Prime Contractor**. The Government will not issue or address any changes in the Prime Contract to the **Subcontractor.** Upon receipt of a request from the Government, the **Prime Contractor** shall promptly notify the **Subcontractor** of any impact on its area of subcontracted work. The **Subcontractor** agrees, upon receipt of written direction from the **Prime Contractor**, to immediately implement the specified modifications. The **Prime Contractor** and the **Subcontractor** shall negotiate an equitable adjustment to this Agreement to reflect such changes to the SOW.

### 10.   TERMINATION

**Prime Contractor** and **Subcontractor** represent that each party understands that the U.S. Government may terminate all or any portion of the Prime Contract in accordance with the applicable Federal Acquisition Regulation ("FAR") termination for convenience clause. If the Prime Contract is terminated under such a FAR termination for convenience clause, **Prime Contractor** may terminate the portion of the work to be performed under this Agreement corresponding to the work terminated by the Government. In the event of such termination, **Subcontractor** shall take all action reasonably necessary to reduce the amount payable from **Prime Contractor** for the terminated portion of the work including, but not limited to, the immediate discontinuance of the terminated work under this Agreement, and the placing of no further requirements for labor, material, or services under the terminated portion. **Subcontractor** agrees to take such action as may be reasonably necessary or as **Prime Contractor** may direct to protect property in **Subcontractor**'s possession in which **Prime Contractor** may have an interest.

(D.I. 1, ex. A)

3. By letter dated November 18, 2013 (D.I. 11, ex.B), the Contracting Officer for the Prime Contract notified PKL that the Government "intend[ed] to exercise [its] option

to extend services of CLINs 0517 and 0519," effective February 5, 2014 for six months ending on August 4, 2014, pursuant to section 52.217-8 of the Prime Contract, which section provides:

> The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within 30 days of the expiration of the option period/contract.

(D.I. 11, ex. A at 194-95) Attached as exhibit A to PKL's answer is a copy of the Prime Contract, as modified to reflect the extension, which "drastically" reduces the scope of services required "to just the two CLINs 17 and 19 covering just the one helicopter (CH-53 D/E)" from Lot 3. (D.I. 11 at 8) According to PKL, the reduced scope of services would in turn reduce PKL's headcount required under the Prime Contract from 282 labor positions to only 86 labor positions for the six-month period. (D.I. 11 at 8) In like manner, JKH argues that it will have to lay off employees and, further, will be irreparably harmed by reason of its "'loss of control of reputation, loss of trade, and loss of good will' through the loss of its sole, active CH-53 D/E maintenance contract." D.I. 14 at 10)[2]

4. **Analysis.** The court concludes, in the first instance, that the Prime Contract has been extended for a period of six months. This conclusion is consistent with the

---

[2] More specifically described as the loss of "its highly skilled employees and accompanying past performance that is critical to maintaining business within the Navy and Marine Corps, in particular, when the United States is faced with continued adversity overseas." (D.I. 14 at 11)

5

plain language of section 52.217-8 and all of the documents of record pertaining to the extension. Given the unambiguous language of section "2" of the Subcontract,[3] the PKL was obligated to extend the Subcontract accordingly. Based on this conclusion, the question remains as to how the Subcontract addresses a reduction in the scope of services required by the Government.[4] JKH identifies section "6" of the Subcontract as the most pertinent to the issue, arguing that the headcount ratios described therein are applicable. PKL identifies section "8," arguing that, when the Government directs changes to the Prime Contract, PKL has the authority to change the scope of services to be provided by JKH, including a cessation of services altogether.[5] The court finds the provisions of section "10" instructive, although not literally applicable, to the circumstances at bar. Under section "10," if the Prime Contract is terminated for the convenience of the Government, PKL "may terminate the portion of the work to be performed under this Agreement corresponding to the work terminated by the Government. In the event of such termination, **Subcontractor** shall take all action reasonably necessary to reduce the amount payable from **Prime Contractor** for the terminated portion of the work under this Agreement. . . ."

5. **Likelihood of success on the merits**. Having concluded that the Prime Contract and, therefore, the Subcontract, has been extended, and having considered

---

[3]To wit, the services of JKH "shall be performed during the period of performance of the Prime Contract, including all Options and extensions thereto."

[4]In this regard, the court suspects that the instant dispute would not have arisen had the scope of services remained the same for the duration of the extension.

[5]Section "8" requires PKL to notify JKH "of any impact on its area of subcontracted work."

the Subcontract together as a whole, which the court is required to do,[6] the court further concludes that JKH has established a likelihood of success on the merits. More particularly, section "6" of the Subcontract provides the means for determining the scope of JKH's services, that is, 25% of the labor force. Under section "10," when the Government "terminates" a portion of the Prime Contract, PKL appears to have no more authority than to "terminate the portion of the work to be performed under this Agreement corresponding to the work terminated by the Government." By essentially terminating all of JKH's services, PKL has breached the Subcontract.[7]

6. **Harm.** Clearly, both of these parties want and need this work, and will suffer economic injury as a result of losing all or part of it. However, the court finds credible the further claims of JKH that, absent a role in the extended Prime Contract, its ability to compete effectively in the future in the areas of expertise included within the scope of the Prime Contract will be irreparably harmed. Moreover, although both parties are well qualified to fulfill the work requirements of the Prime Contract, the public may in fact be harmed if, by virtue of negating the ability of JKH to compete in the future, there are fewer contractors available to satisfy the Government's maintenance needs.

7. **Bond.** Based on the arguments of counsel, the duration of the extension and the value of the extended contract, the court will impose on JKH the burden of posting a

---

[6]The Subcontract must be interpreted objectively according to its plain language, giving effect to each term, and rendering no part of the contract nugatory. *See, e.g., Estate of Osborn v. Kemp,* 991 A.2d 1153 (Del. 2010).

[7]Although PKL argues that JKH is seeking a mandatory preliminary injunction, the court concludes otherwise, as its injunction maintains the status quo by prohibiting PKL from breaching the contract.

bond in the amount of $750,000.

8. **Conclusion.** For the reasons stated, the court grants JKH's motion for a preliminary injunction. An order shall issue.

_____
United States District Judge